**Bobby HENRY, Petitioner–Appellant,**

v.

**Peggy KERNAN, Warden; Daniel E. Lungren, Attorney General, Respondents–Appellees.**

No. 98–15768.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1999

Filed May 26, 1999

Amended Oct. 25, 1999

---

Connie M. Alvarez, Assistant Federal Defender, Sacramento, California, for the petitioner-appellant.

Gregory W. Baugher, Assistant Attorney General, Sacramento, California, for the respondents-appellees.

Before: SNEED, TASHIMA, and SILVERMAN, Circuit Judges.

### ORDER

The opinion filed May 26, 1999, is amended as follows:

On slip opinion page 5056, following the second full paragraph (177 F.3d at at 1158, following the first full paragraph, left-hand column), immediately preceding Part II.B, add the following four (4) paragraphs:

The State contends, as its fallback position, that Henry's post-*Miranda* statements did not lose their voluntariness until after Henry's inquiry of whether he was "supposed to keep talking without an attorney," was interrupted by Detective White's statement, "Listen, what you tell us we can't use against you right now ... We'd just would like to know." By that time, Henry had already made a series of admissions. We recognize, of course, that a post-*Miranda* voluntary statement may be used for impeachment purposes. *See, e.g., Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Cooper*, 963 F.2d at 1250. Even assuming, however, that the State's fallback contention would ordinarily have convincing force, there are two factors in this case which, when combined, distinguish this case from past cases.

The first factor is that the sheriff's officers set out in a deliberate course of action to violate *Miranda*. As the State has acknowledged, "it has been conceded that the detectives knew they were violating *Miranda* when they continued questioning the petitioner after he requested counsel...." (State's Petition for Rehearing and Suggestion for Rehearing En Banc at 2–3.) The State's concession is supported by the record. Thus, like *Cooper*, this case is also distinguishable from *Harris* in that

> *Harris* was a case where no claim [was made] ... that the police knowingly engaged in calculated misconduct in order to secure the disputed evidence. Moreover, it does not appear that the purpose of the police in *Harris* in securing the disputed evidence was to impinge on the suspect's right to remain silent or his right to testify. In these respects, *Harris* is manifestly distinguishable and thus inapposite to the present case.

*Cooper*, 963 F.2d at 1249 (brackets in the original) (internal quotation marks

omitted) (citing *Harris*, 401 U.S. at 224, 91 S.Ct. 643).

The second factor is that in California out-of-court statements admitted for impeachment are also admitted for the truth of the matters asserted therein, *i.e.*, also admitted for substantive purposes. *See* Cal. Evid.Code §§ 1220, 1235. Thus, in California, out-of-court statements admitted for impeachment are, in fact, admitted for the purpose of proving the defendant's guilt. No limiting instruction was given in this case that Henry's post-*Miranda* statements could be used only to assess Henry's credibility, the classic use of prior inconsistent statements for impeachment, but not to establish the truth of the matters asserted therein. In fact, in this case, the primary evidence which established Henry's motive and rebutted his claim of self-defense was Henry's post-*Miranda* statements. Thus, it is a misnomer to say that Henry's post-*Miranda* statements were admitted for "impeachment." Their primary use was to establish an essential element of the crime charged, as the prosecution argued.

Based on the specific facts of this case, we conclude that the State should not be permitted to use post-*Miranda* statements where the officers set out deliberately to violate a suspect's *Miranda* rights and the evidence obtained in violation of *Miranda* is used to prove the defendant's guilt, even though it is admitted in the guise of impeachment. Thus, for this further reason, we conclude that the state trial court erred in permitting the prosecution to use Henry's post-*Miranda* statements for the truth of the matters asserted therein, as well as for impeachment as a prior inconsistent statement.

With the foregoing amendment, the panel has voted unanimously to deny the petition for panel rehearing. Judges Tashima and Silverman vote to deny the petition for rehearing en banc and Judge Sneed so recommends. The full court has been ad-

vised of the petition for rehearing en banc and no judge of the court has requested a vote on en banc rehearing. *See* Fed. R.App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc are denied.

## OPINION

TASHIMA, Circuit Judge:

We must decide whether a confession concededly obtained in violation of *Miranda* [1] was involuntarily made so as to prohibit its use for impeachment purposes at trial. Contrary to the recommendation of the magistrate judge, to whom the case had been referred, the district court denied habeas relief to Bobby Henry ("Henry"), finding that his Fifth Amendment privilege against self-incrimination and his constitutional right to privacy were not violated. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, and we reverse and remand.

## I.

Henry was arrested for killing Bill Withrow after he turned himself in to the Sacramento County Sheriff's Department. Following his arrest, Henry was questioned for several hours by Detectives White and Machen. The two detectives continued to interrogate Henry after he requested counsel. In response to the detectives' further questioning, Henry made a detailed confession.

An information was filed in the Sacramento County Superior Court charging Henry with murder. The first trial ended in a mistrial after the jury deadlocked. At the second trial, a hearing was held to determine whether Henry's post-*Miranda* statements to the detectives were admissible for impeachment purposes. Henry sought to have his statements suppressed on the ground that the questioning violated his Fifth Amendment right to silence and his right to the assistance of counsel.

The state court agreed that the statements violated *Miranda* and excluded them from use during the prosecution's case-in-chief. It found, however, that the statements were voluntary and therefore could be used for impeachment purposes if Henry testified.

Some months prior to the killing, Henry, a civilian employee at McClellan Air Force Base, was referred by his supervisor to Dr. Sander, an occupational health physician on the base. Henry confided in Dr. Sander that he felt like killing a number of people, including Withrow, who had allegedly cheated Henry out of his life savings. At the time of his discussions with Dr. Sander, Henry believed him to be the "base shrink."

At the state court hearing, Henry also sought to exclude Dr. Sander's testimony on the ground that it was covered under the California psychotherapist-patient privilege, Cal. Evid.Code § 1014. Whether Henry had a reasonable belief that Dr. Sander was a psychotherapist was a central issue at the hearing. The trial court ruled that the psychotherapist-patient privilege did not apply because it was unreasonable for Henry to believe that Dr. Sander was a psychotherapist.

Henry testified that he acted in self defense and the post-arrest statements were introduced to impeach him during cross-examination. The prosecution subsequently called Detective Machen as a rebuttal witness and played the entire tape recording of Henry's interrogation for the jury. Each juror was also provided with a copy of the transcript of the interview. Henry was convicted of second degree murder.

After exhausting his claims in state court, Henry filed the instant petition for habeas relief under 28 U.S.C. § 2254. He contends that: (1) his statements to police interrogators were elicited in violation of the Fifth Amendment, were involuntary, and were improperly admitted for any pur-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

pose at trial; and (2) the trial court's admission of his statements to his doctor violated his constitutional right to privacy. The district court denied his petition for habeas corpus and issued a certificate of probable cause.[2] Henry timely appealed.

## II. Fifth Amendment Claim

■■■ The district court's decision to grant or deny a § 2254 habeas petition is reviewed de novo. *See Eslaminia v. White,* 136 F.3d 1234, 1236 (9th Cir.1998). Findings of fact relevant to the district court's decision are reviewed for clear error. *See Moran v. McDaniel,* 80 F.3d 1261, 1268 (9th Cir.1996). State court factual determinations are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Villafuerte v. Stewart,* 111 F.3d 616, 626 (9th Cir.1997), *cert. denied,* 522 U.S. 1079, 118 S.Ct. 860, 139 L.Ed.2d 759 (1998); *Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir.1991) (en banc).

■■■ To prevail on his Fifth Amendment claim, Henry must demonstrate that: (1) his statements were obtained by the police in violation of *Miranda;* (2) the state court committed error in permitting the prosecution to use these improper statements; and (3) the error had a substantial and harmful influence on the jury's determination of its verdict. *See Pope v. Zenon,* 69 F.3d 1018, 1020 (9th Cir.1995). Post-*Miranda* confessions which are found to be involuntary may not be admitted for any purposes, including impeachment. *See United States v. Polanco,* 93 F.3d 555, 560 (9th Cir.1996). Accordingly, we must first determine whether Henry's statements to the police were voluntary.

### A. Voluntariness of confession.

■■■ It is uncontested that the police officers in this case deliberately violated Henry's *Miranda* rights by continuing with their interrogation after he unequivocally requested an attorney. Despite this violation, both the state trial court and the district court found, and the State continues to argue, that the petitioner's statements were "voluntary and not the result of coercion," and therefore admissible for impeachment.

■■■ The voluntariness of a confession is reviewed de novo, *see Collazo,* 940 F.2d at 415, as is the presence of coercive police activity, *see Derrick v. Peterson,* 924 F.2d 813, 818 (9th Cir.1990). The state court's conclusion regarding whether Henry's confession was voluntary is also reviewed de novo, as it is a legal conclusion, and therefore not entitled to a presumption of correctness. *See Collazo,* 940 F.2d at 415; *Medeiros v. Shimoda,* 889 F.2d 819, 822 (9th Cir.1989).

Henry contends that the California trial court erred in allowing his post-*Miranda* statements to be used for impeachment purposes, since he was subjected to psychological coercion from the detectives during his interrogation. The State counters that although the detectives did continue illegally to question Henry after he had invoked his right to counsel, the statements he made were voluntary, and thus properly admitted at trial.

■■■ Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will. *See Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Derrick,* 924 F.2d at 818. Voluntariness depends on such factors as the surrounding circumstances and the combined effect of the entire course of the officers' conduct upon the defendant. *See Polanco,* 93 F.3d at 560. The test of voluntariness is well established: "Is the con-

---

**2.** Because the petition was filed prior to April 24, 1996, the date of enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), the AEDPA does not apply to this case. *See Lindh v. Murphy,* 521 U.S. 320, 323–24, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Crandell v. Bunnell,* 144 F.3d 1213, 1215 n. 1 (9th Cir.1998).

fession the product of an essentially free and unconstrained choice by its maker? ... The line of distinction is that at which governing self-direction is lost *and compulsion, of whatever nature or however infused,* propels or helps to propel the confession." *Collazo*, 940 F.2d at 416 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)) (alteration in the original).

A review of the interview transcript illustrates that Henry's questioning by the detectives was psychologically coercive. Although both the California Court of Appeal and the district court found that the interrogation was conducted calmly in a relaxed setting,[3] this determination is belied by the actual record of the interrogation.

The interview proceeded as follows: After some general initial inquiries, the officers told the defendant that he was under arrest for murder, and advised him of his rights. Henry responded by asking if he could have his lawyer there, then saying he should probably have a lawyer, and finally confirming that he wanted an attorney. Despite these clear and repeated invocations of his *Miranda* rights, however, the officers continued to question Henry. Immediately after Henry's request for an attorney, Detective White asked, "Why did you shoot him anyway?" When Henry responded "Pardon," the officer again asked, "Why did you shoot him?" The officers then proceeded to interrogate Henry for an hour.

In response to Detective White's initial two questions as to why he had shot Withrow, Henry answered that he had written multiple checks to Withrow, that Henry couldn't figure out how much money Withrow owed him, that Withrow had "cheated

[him] out of money," and that due to his loss of savings, Henry was losing his property. Immediately after these statements, Henry inquired whether he was "supposed to keep talking without an attorney." Detective White interrupted him to state, "Listen, what you tell us we can't use against you right now ... We'd just would like to know."

At that, petitioner began a long, often incoherent, and confused statement which began, "It started two years after the divorce," and included not only information about Henry's interactions with Withrow but also about Henry's divorce, his property, his automobile accident and head injury, his job, his guns, his children, deer hunting, an old vehicle his brother-in-law was fixing, his experiences in Vietnam, taking his trailer up in the woods, and his frustrated ambition to be a highway patrolman. As evidenced by the transcript, Henry's statements were rambling, disjointed, often unresponsive to the questions asked by the officers, occasionally inaudible, and sometimes virtually incoherent. Throughout his interrogation, petitioner was shaken, confused, and frightened, crying in parts and frequently asking for forgiveness.

We conclude that the slippery and illegal tactics of the detectives overcame Henry's will and that he continued his confession only as a result of their deception. Officer White's statement that "what you say can't be used against you right now" was deliberately designed to undermine Henry's ability to control the time at which the questioning occurred, the subjects discussed, and the duration of the interrogation. Such misleading comments were intended to convey the impression that anything said by the defendant would

---

3. The district court found that all of the participants in the interview, including the defendant, spoke in a "quiet, matter of fact tone of voice." This finding, however, does not undermine the conclusion that Henry was confused and frightened. Although the tone of Henry's voice may have been "matter of fact" in the beginning of the interview, the tran-

script shows that he was sobbing by its end. Further, distress is not invariably reflected in the tone of voice; fear can manifest itself in many ways. The interview transcript reveals a confused and frightened defendant who garbled his sentences, was frequently inaudible, and was often entirely incoherent for long passages.

not be used against him for any purposes. White's further comment that "we just want to know" reinforced that false impression by suggesting that the officers merely sought to satisfy their curiosity.

In a case with strikingly similar facts, we held that the police's intentional violation of a suspect's *Miranda* rights by continued interrogation rendered any subsequent statements involuntary. *See Cooper v. Dupnik*, 963 F.2d 1220, 1240–41 (9th Cir.1992) (en banc). In *Cooper*, the Arizona police followed a plan to ignore the suspect's invocation of his constitutional right to remain silent, as well as any request he might make to speak with an attorney, and to interrogate him until he confessed. Although the officers knew any confession thus generated would not be admissible in evidence in the prosecution's case-in-chief, the Arizona police, like the Sacramento sheriffs here, hoped it would be admissible for impeachment if the suspect ever went to trial. *See id.* at 1224.

The *Cooper* defendant, like Henry, "was reduced to a state of agitation and anxiety marked by tears and sobbing . . . He repeated his request for an attorney . . . [t]his request, which contain[ed] a statement of unwillingness to talk, as well as a desire to consult an attorney, was disregarded." *Id.* at 1231. As the *Cooper* Court forcefully stated:

> The conduct of the police in the present case . . . is precisely the type of conduct that concerned the Court in *Miranda* and its immediate predecessor, *Escobedo v. Illinois*. The Court in *Miranda* made clear that it remained concerned about the use of physical brutality in the pursuit of confessions, but it focused primarily on psychological coercion. . . . [The] Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.

*Id.* at 1241–42 (citations and quotations omitted).

Like the Sacramento sheriffs, the Arizona police refused to honor Cooper's rights when he asserted them, and simply continued questioning him as if no request for counsel had been made. This tactic was designed to generate a feeling of helplessness, and, as we concluded, it was successful:

> [Defendant]'s treatment presents a prima facie case of law-enforcement behavior that violates the Fifth Amendment's privilege against self-incrimination. We stress again that this case does not deal with a product of police interrogation that is just technically involuntary, or presumptively involuntary, as those terms are used in *Miranda* jurisprudence, but with a product that was involuntary *because it was actively compelled and coerced* by law-enforcement officers during in-custody questioning.

*Id.* at 1243.

As we have previously noted, "*Miranda* expresses concern about the compelling pressures that weigh upon a person in custody, pressures that can break a person's free will and cause that person to talk involuntarily." *Collazo*, 940 F.2d at 417. Detective White took unfair advantages of these pressures. At a point where the law required him to back off, he did not scrupulously honor Henry's right to cut off questioning; instead, he ignored it. Any minimally trained police officer should have known such pressure was improper and likely to produce involuntary statements. *See id.* Because the police tactics and trickery produced a confession which was neither rational nor the product of an essentially free and unconstrained choice, we hold that Henry's post-Mirandized statements were involuntary, and therefore inadmissible for any purpose. The state trial court erred in permitting the prosecution to use these statements for impeachment purposes.

 The State contends, as its fall-back position, that Henry's post-*Miranda* statements did not lose their voluntariness until after Henry's inquiry of whether he

was "supposed to keep talking without an attorney," was interrupted by Detective White's statement, "Listen, what you tell us we can't use against you right now ... We'd just would like to know." By that time, Henry had already made a series of admissions. We recognize, of course, that a post-*Miranda* voluntary statement may be used for impeachment purposes. *See, e.g., Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Cooper,* 963 F.2d at 1250. Even assuming, however, that the State's fallback contention would ordinarily have convincing force, there are two factors in this case which, when combined, distinguish this case from past cases.

The first factor is that the sheriff's officers set out in a deliberate course of action to violate *Miranda.* As the State has acknowledged, "it has been conceded that the detectives knew they were violating *Miranda* when they continued questioning the petitioner after he requested counsel...." (State's Petition for Rehearing and Suggestion for Rehearing En Banc at 2–3.) The State's concession is supported by the record. Thus, like *Cooper,* this case is also distinguishable from *Harris* in that

> *Harris* was a case where no claim [was made] ... that the police knowingly engaged in calculated misconduct in order to secure the disputed evidence. Moreover, it does not appear that the purpose of the police in *Harris* in securing the disputed evidence was to impinge on the suspect's right to remain silent or his right to testify. In these respects, *Harris* is manifestly distinguishable and thus inapposite to the present case.

*Cooper,* 963 F.2d at 1249 (brackets in the original) (internal quotation marks omitted) (citing *Harris,* 401 U.S. at 224, 91 S.Ct. 643).

The second factor is that in California out-of-court statements admitted for impeachment are also admitted for the truth of the matters asserted therein, *i.e.,* also admitted for substantive purposes. *See* Cal. Evid.Code §§ 1220, 1235. Thus, in California, out-of-court statements admitted for impeachment are, in fact, admitted for the purpose of proving the defendant's guilt. No limiting instruction was given in this case that Henry's post-*Miranda* statements could be used only to assess Henry's credibility, the classic use of prior inconsistent statements for impeachment, but not to establish the truth of the matters asserted therein. In fact, in this case, the primary evidence which established Henry's motive and rebutted his claim of self-defense was Henry's post-*Miranda* statements. Thus, it is a misnomer to say that Henry's post-*Miranda* statements were admitted for "impeachment." Their primary use was to establish an essential element of the crime charged, as the prosecution argued.

Based on the specific facts of this case, we conclude that the State should not be permitted to use post-*Miranda* statements where the officers set out deliberately to violate a suspect's *Miranda* rights and the evidence obtained in violation of *Miranda* is used to prove the defendant's guilt, even though it is admitted in the guise of impeachment. Thus, for this further reason, we conclude that the state trial court erred in permitting the prosecution to use Henry's post-*Miranda* statements for the truth of the matters asserted therein, as well as for impeachment as a prior inconsistent statement.

**B. Harmless error.**

We must next decide whether admission of the statements for impeachment purposes was harmless error. *See Arizona v. Fulminante,* 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Pope,* 69 F.3d at 1025. In the context of habeas review, the standard is whether the error had substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). We must conduct this analysis "with an awareness that 'a confession is like no other evidence,' and that a full

confession may have a 'profound impact' on the trier of fact." *Pope*, 69 F.3d at 1025 (quoting *Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246).

We hold that the introduction of Henry's post-*Miranda* statements for impeachment purposes had a substantial and injurious effect on the jury. The critical evidence used to establish Henry's motive for the shooting was the challenged statements to the police, since the State primarily relied on Henry's confession to prove that his motive for killing Withrow was not fear and self-defense, but his desire for revenge.

At trial, Henry testified that he feared Withrow and his associates because he had seen Withrow with guns at home and in the office, and he had heard that Withrow's associates were Hell's Angels. Henry stated that when he went to meet with Withrow, he took his guns with him for the purposes of protecting himself; he had not planned to kill Withrow. Henry argued that he shot Withrow because he thought Withrow was reaching for a gun in the drawer and was about to shoot him.

After Henry's testimony, the prosecution called Detective Machen, one of Henry's interrogators, as a rebuttal witness. The prosecution introduced the tape-recorded interview of Henry to show that the defendant had not told police officers he killed Withrow in self-defense, nor told the officers that he thought Withrow was reaching for a gun when Henry shot him. In closing arguments, the prosecutor mentioned the interrogation, and argued that during the interview Henry "couldn't give an answer why he took those guns or he didn't want to admit why he took them." Importantly, the prosecutor referred to Henry's motivation for shooting Withrow as "the crux of the case."

The State's use of the challenged statements went to the root of their burden to prove beyond a reasonable doubt that Henry acted with the intent required for a conviction of first or second degree murder, and not in self-defense. This use of Henry's confession had a substantial effect on the verdict. No other evidence of intent could have impressed the jury in the same way that defendant's own statements did, *see Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246, particularly because his confession was played in full for the jury. The error in admitting Henry's statements was substantial and injurious.

Accordingly, because Henry's post-Mirandized statements were involuntary, and the error in admitting Henry's statements had a substantial and injurious effect on the jury's verdict, we grant Henry habeas relief on his Fifth Amendment claim.[4]

### III. Constitutional Privacy Claim

■ Henry also seeks habeas relief on the ground that his constitutional right to privacy was abridged when the state trial court compelled his doctor to testify concerning confidential doctor-patient communications.[5] Henry argues that his communications with Dr. Sander, a medical doctor whom Henry believed to be a psychotherapist, should have been constitutionally privileged. The factual predicate for this claim is undercut, however, by the fact that Dr. Sander was not a psychotherapist and the state court's finding that it was not reasonable for Henry to believe that Dr. Sander was a psychotherapist. There can be no psychotherapist-patient privilege or right to privacy based thereon, constitu-

---

4. Henry additionally contends that the district court erred in granting the State's motion to strike his declaration of his state of mind at the time of his confession. We need not reach this argument, however, because we grant habeas relief on Henry's Fifth Amendment claim.

5. In his state court trial, Henry asserted that his communications to Dr. Sander were privileged under Cal. Evid.Code § 1014, which provides that the patient may refuse to disclose and may prevent anyone else from disclosing confidential communications between the patient and his or her psychotherapist. *See* Cal. Evid.Code § 1014(a).

tional or otherwise, if there is no psychotherapist.[6]

■ Moreover, there is no constitutional psychotherapist-patient privilege, only a federal evidentiary one. Although the Supreme Court, in *Jaffee v. Redmond,* 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), recognized a psychotherapist-patient privilege, it looked exclusively to the Federal Rules of Evidence for authorization. Henry has pointed to no Supreme Court or Ninth Circuit case which recognizes a constitutional privilege for psychotherapist-patient communications, nor any cases which use *Jaffee* to support a constitutional psychotherapist-patient privilege. Therefore, at best, Henry's challenge to the admissibility of Dr. Sander's testimony and notes is a challenge to an evidentiary ruling based on state law.

■ A federal habeas court, of course, cannot review questions of state evidence law. On federal habeas review, we may consider only whether the petitioner's conviction violated constitutional norms. *See Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). Even where it appears that evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial. *See Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *Jeffries v. Blodgett,* 5 F.3d 1180, 1192 (9th Cir.1993).

Henry has not made a showing that the admission of Dr. Sander's testimony violated due process or his right to a fair trial. At Henry's trial, two witnesses testified that Henry had complained to them about Withrow's handling of his money and property; one of these witnesses further testified that Henry had commented to her that he should do the world a favor and kill Withrow. Thus, Dr. Sander's testimony regarding Henry's confidences did not con-

stitute the only evidence that Henry had stated he felt like killing Withrow, or that Henry might have been motivated by revenge. Henry has failed to demonstrate that the admission of Dr. Sander's testimony and notes so fatally infected his trial as to render it fundamentally unfair or that the violation of his privacy resulted in a complete miscarriage of justice. *See Jammal,* 926 F.2d at 919. Accordingly, we affirm the district court's denial of habeas relief to Henry on his constitutional privacy claim.

## IV.

Since Henry's post-Mirandized statements were involuntary, and the error in admitting those statements was substantial and injurious, we grant habeas relief on the Fifth Amendment claim, and reverse the district court's denial of the petition for writ of habeas corpus. The case is remanded to the district court with directions to issue a conditional writ of habeas corpus ordering Henry's release, unless the State of California shall retry Henry within a reasonable period of time without using his post-*Miranda* confession.

**REVERSED and REMANDED with directions.**

---

**6.** California has no physician-patient privilege in criminal proceedings. *See* Cal. Evid.Code § 998.