**UNITED STATES of America,
Plaintiff,**

**v.**

**Pamela BETTERS, Defendant.**

**No. CRIM.01–164–KI.**

United States District Court,
D. Oregon.

April 8, 2002.

Michael W. Mosman, United States Attorney, District of Oregon, Frank Noonan, Assistant United States Attorney, Portland, OR, for Plaintiff.

Steven T. Wax, Federal Public Defender, Portland, OR, for Defendant.

## OPINION

KING, District Judge.

Defendant Pamela Betters is charged with a violation of 18 U.S.C. § 922(g)(1) as a felon in possession of ammunition. Before the court is defendant's motion to suppress statements (#18) and motion to suppress physical evidence (#41), specifically all statements made by her to law enforcement officers during her arrest and the ammunition taken from her person.

### FACTS

The following facts were proven at an evidentiary hearing.

Officers Gradwahl and Reagan were working as uniform patrol officer for the Portland Police Bureau on the evening of March 7, 2001. At 3:20 AM, they were dispatched to a disturbance at NE 43rd and NE Klickitat. Officer Leo Yee arrived less than a minute later and Officer Strobal arrived after Yee. The officers were all in uniform with weapons that none of them drew during the encounter.

On arrival, Gradwahl and Reagan could hear a female voice screaming from inside of a small building in the nature of a shed or garage. The door was open and the light on. The officers looked in the garage and saw defendant Pamela Betters with her pants pulled down, screaming curses at Greg Burkitt and threatening to urinate on his garage floor. Betters was surprised to see the officers, but they identified themselves and she pulled up her pants.

Yee first spoke to Greg Burkitt, who was outside of the garage when Yee arrived. Yee then entered the garage, and spoke to Betters. Gradwahl and Reagan were also in the garage at times with Yee. The garage was very cluttered, with an area only six feet in diameter that was available for standing. Betters told Yee that she and Burkitt had an argument but that there had been no hitting involved. Yee asked Betters if they could search her. She replied "sure" and began to remove her jacket. Yee asked Reagan to perform the search and left the garage.

Reagan asked Betters a second time if he could search her for drugs or weapons. She said "yeah" and put her hands on top of her head. Reagan found ammunition in Betters' pocket. Gradwahl read Betters her *Miranda* rights from a card and asked if she understood. Betters said yes.

Gradwahl then took Betters outside and spoke to her on the sidewalk. She calmed down during this conversation. Betters told Gradwahl that she had never seen the ammunition and that Burkitt might have put it in her pocket. She said Burkitt had two guns hidden inside. Gradwahl then spoke to Burkitt's mother. Mrs. Burkitt gave him two guns, one of which matched the ammunition taken from Betters during the search. Gradwahl told Betters that he had found the guns and asked her again about the ammunition. Betters admitted that she had the guns after removing them from Burkitt's drawer out of fear of him, and that Mrs. Burkitt took the guns away from her.

Mrs. Burkitt testified that she had taken the guns from Betters when she asked Betters for her car keys. Mrs. Burkitt worked for four years as the intake clerk at the Hooper Detoxification Center. On

the night in question, Betters was very intoxicated, was slurring her speech, was very belligerent, and had incoherent periods as well as periods where she tracked conversations. Comparing Betters' level of intoxication to the patients being admitted to Hooper, Mrs. Burkitt described Betters as a "ten," meaning as bad as she had seen at Hooper.

During the encounter, Betters' mood swung a few times between belligerence and cursing to calmer moments. At some point after the search, the officers handcuffed Betters when she became belligerent again. When Gradwahl and Reagan transported Betters to the jail, she became agitated again and threatened to shoot them and their families.

Yee and Gradwahl thought that Betters was very intoxicated. Her words were slurred, she could not stop moving around, and she constantly moved her hands and arms. They also thought she might have used another drug because her pupil dilation was not normal. In spite of this, Betters responded appropriately to Yee's questions and never indicated that she did not understand. She never asked for a lawyer or other assistance. None of the officers threatened Betters if she did not consent to being searched.

Dr. Richard Kolbell, a psychologist, tested Betters after her arrest and testified on her behalf. He diagnosed Betters with bipolar disorder with psychotic features, alcohol abuse, polysubstance abuse, a history of attention deficit hyperactive disorder, post traumatic stress disorder, and borderline personality disorder. Numerous other doctors who had examined Betters throughout her life had given similar diagnoses, especially for bipolar disorder.

On the night in question, Betters had been off her medication for three months. Dr. Kolbell believes that Betters was in a manic phase at that time but cannot say with certainty. Betters has blackouts and does not remember the night. Other cognitive processes may be interrupted during blackout periods. Depending on the particular function being tested, Betters is in the low 2 to 16th percentile of the population for general intellectual functioning. Her general fund of information is in the 5th percentile, as well as her abstraction ability. Complicated situations, as well as mania and intoxication, impair her abilities even further.

In Dr. Kolbell's opinion, on the night in question, Betters could not appreciate the nature of the requests, the rights she was giving up, and the possible consequences. Even if sober and appropriately medicated, Betters would have profound difficulty making a reasoned decision without a careful explanation.

## DISCUSSION

The government must prove that Betters validly waived her *Miranda* rights, that she voluntarily made the statements at issue, and that she voluntarily consented to the search of her person.

### I. *Waiver of Miranda Rights*

 Before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A valid waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *United States v. Bautista–Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993). The prosecution must prove that "the defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it.' "

*United States v. Garibay*, 143 F.3d 534, 536 (9th Cir.1998) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Whether a waiver is valid depends on the totality of the circumstances, including the background, experience, conduct, age, and language difficulties of the defendant. *Id.; United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). The government must prove by a preponderance of the evidence that a suspect. validly waived his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

■ Betters has severe limitations on her mental abilities, even under the best of conditions. When she waived her *Miranda* rights, Betters was highly intoxicated from alcohol, possibly under the influence of another drug, off her psychotropic medications, and likely in a manic state. These factors all worsen her ability to reason. The concepts in a *Miranda* waiver concerning the nature of the right, and even more so, the consequences of abandoning the right, are abstract ones. Betters' abstract reasoning ability is one of the areas in which her limitations are the greatest. Dr. Kolbell's testimony convinces me that Betters was not able to understand these concepts when she waived her rights.

I conclude the government has not proven that the Betters' *Miranda* waiver was knowing and intelligent. Thus, her statements are suppressed from the government's case in chief. *United States v. Andaverde*, 64 F.3d 1305, 1310 (9th Cir. 1995) (statements made in a custodial interrogation without first being advised of *Miranda* rights are excluded from evidence at trial in government's case in chief), *cert. denied*, 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996).

II. *Voluntariness of the Confession*

■ The government must establish the voluntariness of a confession by a preponderance of the evidence. *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir.1992). When considering whether a confession is voluntary, a court must consider the totality of the circumstances, including the background, experience, conduct, and mental capacity of the defendant. *United States v. Garibay*, 143 F.3d 534, 536, 538 (9th Cir.1998). A confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will. *Henry v. Kernan*, 197 F.3d 1021 (9th Cir.1999), cert. denied, 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000).

> The test of voluntariness is well established: "is the confession the product of an essentially free and unconstrained choice by its maker? ... The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

*Id.* at 1027 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)).

■ Overreaching includes lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion. *Kelley*, 953 F.2d at 565. A confession can be voluntary even if it is the product of a drug or alcohol induced statement. *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir.1989), *cert. denied*, 496 U.S. 938, 110 S.Ct. 3219, 110 L.Ed.2d 666 (1990). A confession obtained by physical violence is *per se* involuntary; a confession obtained by psychological coercion is not. *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir.), *cert. denied*, 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). When there is alleged psychological coer-

cion, the issue is whether the defendant's will was overborne when he confessed. *Id.* at 1031.

The Court considered the effect of mental illness on the voluntariness of a confession in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Defendant traveled from Boston to Denver, approached a police officer, and confessed to a murder. The officer *Mirandized* defendant, who repeated that he understood his rights but still wanted to talk about the murder. The officer questioned defendant and found out that defendant had taken no drugs and had not been drinking, but had been a patient in several mental hospitals. The officer again told defendant that he had no obligation to talk but defendant insisted that he wanted to clear his conscience. A detective came, again advised defendant of his rights, and then heard defendant's full confession which included taking the officers to the scene of the killing. *Id.* at 160, 107 S.Ct. 515.

Up to this point, defendant showed no indication that he suffered from mental illness. He was held overnight and interviewed the next morning by the public defender's office. At that interview, defendant became disoriented and said that the voice of God told him to come to Denver to confess. At a hearing to suppress the statements, a psychiatrist testified that defendant had chronic schizophrenia and was in a psychotic state from at least the day prior to his confession. The voice of God told defendant to either confess to the killing or to commit suicide. The psychiatrist believed that defendant was experiencing command hallucinations which interfered with his volitional ability, namely his ability to make free and rational choices. He also testified that the illness did not impair defendant's cognitive abilities so he understood his *Miranda* rights when advised. The trial and state supreme court suppressed defendant's

statements, finding that they were involuntary. The courts also found that the police had committed no wrongful acts. *Id.* at 161–62, 107 S.Ct. 515.

The Court first noted that its precedent focused on "the crucial element of police overreaching." It distinguished a case in which the police exploited a suspect's known mental illness with coercive tactics including a eight to nine hour sustained interrogation. *Id.* at 163, 107 S.Ct. 515. The Court reversed, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167, 107 S.Ct. 515.

In contrast, sufficient police coercion occurred in *Henry v. Kernan,* 197 F.3d 1021 (9th Cir.1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000), for the court to hold that the confession was involuntary and thus inadmissible for any purpose. *Id.* at 1028. Detectives admittedly continued a custodial interrogation after the suspect clearly invoked his *Miranda* rights by requesting a lawyer. Their questioning resulted in the suspect's statement the court described as long, often incoherent, confused, rambling, disjointed, and often unresponsive to the questions asked by the detectives. During the interrogation, the suspect was "shaken, confused, and frightened, crying in parts and frequently asking for forgiveness". *Id.* at 1027.

■ I see no evidence of police coercion here. Although the officers knew that Betters was intoxicated, they had no idea that she was mentally ill. The *Miranda* violation was unintentional. The questioning did not last long. The area in the garage was not so crowded that it became psychologically coercive. I find that Betters' statements were voluntary. Conse-

quently, they may be used for impeachment purposes. *Id.* at 1029.

### III. *Voluntariness of the Consent to Search*

The government must prove that a consent to search is voluntary by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). A consent given to search is valid if the consent was freely and voluntarily given and not the result of duress or coercion, express or implied. Whether the consent given to search was freely and voluntarily given is a question of fact to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The factors that a court considers in determining whether the consent to search was voluntary may include, but are not limited to: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given prior to the search; (4) whether the defendant was told he had the right to withhold consent; and (5) whether the officers claimed that they could obtain a search warrant. *United States v. Torres–Sanchez,* 83 F.3d 1123, 1129 (9th Cir.1996) (citing *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1988)). No one factor is dispositive and the fact that some of the factors are not established "does not automatically mean that consent was not voluntary." *Torres–Sanchez,* 83 F.3d at 1130; *Castillo,* 866 F.2d at 1082. In particular, the lack of *Miranda* warnings is not dispositive of whether a consent to search was voluntary. *Torres–Sanchez,* 83 F.3d at 1130.

Betters consented twice to be searched, although the consents were prior to *Miranda* warnings and she was not told that she could withhold consent. The officers never drew their guns, threatened Betters, or told her that they would just get a warrant. There is no evidence that the officers took advantage of her intoxicated state or her mental illness. Both times, Betters rapidly consented and repositioned herself to allow the search to proceed more easily. I again conclude that there was no police coercion, either express or implied, which caused Betters to consent to be searched, and that her consent was voluntary. Accordingly, I deny the motion to suppress the physical evidence.

### CONCLUSION

Defendant's motion to suppress statements (# 18) is granted in part and denied in part. Defendant's motion to suppress physical evidence (# 41) is denied.