ORDER
The majority opinion and concurrence filed on July 5, 2017, and appearing at 862 F.3d 809, are hereby amended. An amended majority opinion and concurrence are filed concurrently with this order.
The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for panel rehearing and rehearing en banc is DENIED. No new Petition for Panel Rehearing or Petition for Rehearing en Banc will be entertained.
Concurrence by Judge Christen
OPINION
W. FLETCHER, Circuit Judge:
In 1982, Tracy Petrocelli was convicted and sentenced to death in Nevada state court for the robbery and first-degree murder of James Wilson, a Nevada used car salesman. Petrocelli filed a federal petition for writ of habeas corpus before the effective date of the Antiterrorism and Effective Death Penalty Act (“AEDPA”). Pe-trocelli appeals the district court’s denial of the writ.
We affirm the district court’s denial of the writ with respect to Petrocelli’s conviction but reverse with respect to his death sentence. We hold that admission of Dr. Lynn Gerow’s psychiatric testimony during the penalty phase violated Petrocelli’s Fifth and Sixth Amendment rights under Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and that the violation had a substantial and injurious effect on the jury’s decision to impose the death sentence. See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).
I. Background
A. Crime, Arrest, and PreTrial Interrogations
On March 29, 1982, Petrocelli went on a test drive of a Volkswagen pickup truck with James Wilson, a used car salesman, in Reno, Nevada. At some point during that test drive, Petrocelli shot and killed Wilson. Wilson’s body was found buried in a crevice under some rocks and brush near Pyramid Lake. The lake is about thirty-five miles north of Reno. Wilson had been shot in the neck, chest, and back of the head.
Nearly a year before killing Wilson, in May 1981, Petrocelli had pleaded guilty in *715 Washington State to kidnaping his girlfriend, Melanie Barker. He had received a suspended sentence conditioned on his completion of a drug treatment program. Petrocelli absconded from the treatment program twice and never completed it. Petrocelli shot and killed Barker in Washington State in October 1981, five months before he killed Wilson in Nevada.
Petrocelli was arrested for the Wilson murder in Las Vegas on April 18, 1982. The following day, he was interrogated in Las Vegas. Petrocelli was advised of his Miranda rights, and he signed a statement indicating that he understood them. Petroeelli stated during the interrogation, “I’d sort of like to know what my .., lawyer wants me to do.” (Ellipsis in original.) He nonetheless continued to answer questions. Later in the interrogation, he admitted to having previously stolen a car from a “Dub Peterson” dealership in Oklahoma City after taking it for a test drive with a salesman.
Petrocelli was subsequently transported to Reno. On the afternoon of April 20, he was interrogated by Sergeants Glen Barnes and Abel Dickson, as well as two prosecutors from the District Attorney’s Office of Washoe County, Bruce Laxalt and Don Nomura. At the beginning of the interrogation, Petrocelli made a variety of requests that he characterized as “preconditions” to talking. They included locating some of his property, facilitating a visit by his wife, bringing him photographs of Barker, arranging a television interview, and receiving psychiatric counseling. Dickson testified at a hearing outside the presence of the jury that no promises were made, but that Petrocelli was told that if his requests “could be done they would be done.” After being informed of his Miranda rights, Petrocelli confessed to shooting both Wilson and Barker.
On April 20, the Public Defender of Washoe County was appointed as counsel for Petrocelli by order of the Reno Justice Court. On April 21, Petrocelli personally appeared in the Justice Court, where he was arraigned and bail was set.
The visitors’ log for the Washoe County Jail shows that Larry Wishart, an attorney from the Washoe County Public Defender’s Office, and Tim Ford, an investigator from that office, visited Petrocelli on April 21, the day of his arraignment, at about 1:50 pm. (A date and time stamp of “82 APR 21 P 1 :5” appears on the photocopy of the log. The number specifying the minute is cut off on the photocopy in the trial court record.) A date and time stamp shows that their visit lasted about half an hour (“82 APR 21 2 :2”). The log shows a visit from Dr. Lynn Gerow later that day. Gerow was a psychiatrist who had been asked by Chief Deputy District Attorney Laxalt to evaluate Petrocelli’s competency to stand trial.
The relevant page of the visitors’ log is dedicated exclusively to visitors to Petro-celli. Wishart and Ford’s entry, with their signatures, is on line three of the page. They wrote “WCPD/ATT” in the box asking for their “relationship.” Dr. Gerow’s entry, with his signature, is on line four, immediately below. He wrote “D.A.” in the box asking for his “relationship.” The entry by Wishart and Ford, stating their relationship to Petrocelli, would have been apparent to Gerow when he signed the log. A date and time stamp show that Gerow signed in at about 3:50 (“82 APR 21 P 3 :5”). There is no stamp showing when his visit ended. Gerow testified at trial that he spent two hours interviewing Petrocelli.
Petrocelli testified that he believed that Dr, Gerow had come to see him in response to his request for counseling. During his April 20 interview in Reno, Petrocelli had specified as one of his *716 “preconditions” that he receive psychiatric counseling. Petrocelli testified consistently at a hearing outside the presence of the jury, saying that he had stated as one of his preconditions: “I wanted to have psychiatric counseling while I was in the jail,” He testified that he “saw a doctor Gerow once.” When asked how long he spoke to Gerow, Petrocelli responded, “[I]t didn’t seem like it was very long.” When asked to estimate the time, Petrocelli responded, “Well, I never did even finish my conversation. He just cut me off in the middle and left.”
On April 27, Dr. Gerow sent a letter labeled “confidential” to Prosecutor Laxalt in the District Attorney’s office. He wrote:
At your request I examined Mr. Mai-da {the name under which Petrocelli was then1 being held] at the Washoe County Jail on April 21,1982.1 had an opportunity to discuss his case with you prior to the psychiatric evaluation.
[[Image here]]
Mr, Maida was abused as a child. He was adopted at three years of age.... He was in trouble at school and home at an early age. He developed a psychopathic personality which is complicated by a history of severe drug abuse....
In my opinion Mr. Maida is both competent . for understanding the charges and assisting his attorney and responsible (mens rea) for any alleged offense.
. I have determined to see Mr. Maida in the future on an “as needed” basis. If you require my involvement as circumstances develop, please feel free to call me,
Gerow testified in state post-conviction proceedings that when he wrote “as needed,” he meant “as needed by Mr. Laxalt.”
Wishart testified in state post-conviction proceedings that when he met with Petro-celli on April 21, he did not know that Dr. Gerow was going to see his client later that afternoon. Wishart testified that he would not have employed Gerow because he .“had a prosecution bias.”
Petrocelli was interrogated again on April 27. After being advised of his Miranda rights, Petrocelli made another statement.
B. Guilt Phase Trial
On April 28, 1982, Petrocelli was indicted on one count of robbery with a deadly weapon and one count of first-degree murder. The guilt phase of the trial began on July 27, 1982, and ran through August 5, 1982. At trial, the State contended in support-of the robbery count that Petrocelli went on the test drive with Wilson in order to steal the truck, that' he used his gun to try to force Wilson out of the truck, and that he shot Wilson when Wilson would not cooperate. To bolster its theory, the State called Melvin Powell, an Oklahoma car salesman, to testify that Petrocelli had stolen a car in a similar manner (though without injuring Powell) during a test drive in February 1982.
The defense contended, based on Petro-celli’s testimony at trial, that Petrocelli had been a bona fide prospective purchaser with no intent to steal, and that Wilson was accidentally shot in the midst of a heated argument and struggle that resulted from haggling over, the price of the truck. To impeach Petrocelli’s testimony, the State introduced portions of the statements that Petrocelli had made on April 20 and 27. To undermine Petrocelli’s contention that the Wilson shooting was unintentional, the State impeached Petrocelli with his statement on April 20 that his earlier shooting of his girlfriend, Melanie Barker, was an “accident.” The prosecutor also impeached Petrocelli by confronting him with other inconsistencies between his trial *717 testimony and his statements to the detectives. ■ ■
The jury found Petrocelli guilty of both charges.
C. Penalty Phase Trial
1. Aggravating Factors and Lay Testimony
In order to render Petrocelli death-eligible, the State had to establish at least one aggravating factor. During the penalty phase of Petrocelli’s trial, the State sought to establish two such factors: (1) that the murder had been committed in the course of a robbery, and (2) that Petrocelli had previously been convicted of a violent, felony, the kidnaping of his girlfriend Melanie Barker. (The first factor was later held by the Nevada Supreme Court to be invalid. See McConnell v. State, 120 Nev. 1043, 102 P.3d 606, 624 (2004) (per curiam). In reviewing Petrocelli’s third petition for post-conviction relief, the Nevada Supreme Court held that use of this, factor had been improper.)
To establish the first factor, Prosecutor Laxalt put John Lucas on the stand. Lucas had been in the Washoe County Jail with Petrocelli for about five weeks after Petro-celli’s arrest for the Wilson murder. Lucas testified that Petrocelli had told him that he had shot Wilson in order to steal the truck. He also testified that Petrocelli said he was “going to get rid of’ the district attorney as well as an unidentified woman Petrocelli characterized as a “snitch.”
The second factor was Petrocelli’s conviction for kidnaping Barker. At. trial, it was uncontested that he had later killed her. However, at the time of trial he had not been convicted of the killing. To establish the second factor, Prosecutor Laxalt called Melanie Barker’s mother, Maureen Lawler, to testify about the circumstances that had led to the kidnaping. The jury had already learned during the guilt phase, from Petrocelli’s testimony and from the testimony of an eye-witness, that Petrocelli had killed. Barker.., Lawler testified only as to the circumstances that had led to the kidnaping conviction. Lawler, who had lived with her daughter in the city of Kent, in western Washington, testified that Barker had gone to eastern Washington with Petrocelli for three days, that Barker had been “beaten on the face” and was “hysterical” when she returned home, and that at some point during the three days Barker, had been told by Petrocelli that his friends would “do .away with her.” Lawler testified that after Barker had told Petro-celli that her mother would have the police looking for her, “He agreed to take her back .... At that point, she got away from him.” Lawler also described a phone conversation, prior to the kidnaping, when Lawler had arranged for Petrocelli’s wallet to be taken to the police station. Petrocelli objected tp her having done só, and she testified that Petrocelli said he “would blow me away.” Laxalt also called Joan Bleeker, who testified that Barker had come into a restroom during the time she was in eastern Washington and had asked Bleeker to call the police because she was being kidnaped.
Petrocelli testified, presenting his version of what had happened during the three days in eastern Washington in an attempt to show, despite his conviction, that he had not really kidnaped Barker. According to Petrocelli, Barker went with him voluntarily; they were accompanied by a friend of Petrocelli; they went out in public, eating in restaurants and going to stores together; and she and Petrocelli got in a fight as they were driving back to western Washington.
In the interval between the testimonies of Lawler and Bleeker, Prosecutor Laxalt played a tape recording of a portion of *718 Petrocelli’s interrogation on April 20 in which Petrocelli described the Wilson killing. Petrocelli had cried during his in-court testimony when describing the Wilson killing. The tape recording is not in the record, but it is apparent from the transcript that Laxalt played the tape to contrast Petrocelli’s-tearful demeanor during trial to' an unemotional demeanor on April 20.
2. Professional Mental Health Evidence
Defense counsel Wishart submitted'written reports by three- different mental health professionals — Dr. John Petrich,a psychiatrist; Dr. Martin Gutride, a psychologist; and Dr. John Chappel, a psychiatrist. Wishart called none of the three to give live testimony.
Dr. Petrich’s evaluation of Petrocelli’s mental health and future dangerousness was the most favorable to Petrocelli, but his evaluation was of limited use to the defense. Petrich had evaluated Petrocelli in June 1981, when Petrocelli was in jail in Washington State on the kidnaping charge, prior to killing Barker and Wilson,
Drs. Gutride and Chappel evaluated Pe-trocelli in July 1982, after he had killed Barker and while he was in jail waiting to stand trial for killing Wilson. Gutride reported that Petrocelli was adopted at age two and a half, and had been physically abused by his biological mother. Petrocel-li’s adoptive mother died when Petrocelli was seventeen, and Petrocelli attempted suicide several months after the funeral. After his adoptive mother’s death, he became close to his adoptive father for' a brief time, but fell out of touch after his father remarried. Gutride reported that Petrocelli cried when he spoke about having lost contact with his father. Pétrocelli was “placed in a military academy at age twelve because of discipline problems,” and he joined the Marines at about age seventeen. While in the Marines, Petrocelli was arrested for fighting with policemen while drunk; shortly thereafter, he began going AWOL. He was eventually given a dishonorable discharge. Sometime around 1974, Petrocelli moved to Washington State, began working in a steel mill, and became, by his own admission, “increasingly unstable.” In 1976, he attempted suicide. In 1977, he was arrested for theft but fled before his trial. He became a professional gambler in Reno, Nevada, and began abusing alcohol and drugs. He was arrested in 1980 for kidnaping Barker.
Dr. Gutride reported that Petrocelli “cried openly” during the interview and that his “distraught behavior had the quality of his practically begging for help.” “[H]e -desperately wants to know what is the matter with him and why he did the things he is charged with. He doesn’t deny responsibility, but says he can’t remember most of the circumstances surrounding the various crimes.” According to Gutride, Pe-trocelli told him he “ha[d] called crisis lines in every city, but been unable to get any help” and “ha[d] talked with psychiatrists while in other jails and been put off.”
Dr. Gutride reported that throughout the interview, Petrocelli’s “thought processes were logical and coherent, memory seemed good, but selective, and intelligence seemed quite adequate.” However, “[ojnce formal testing began, the client seemed to lose those qualities. The difference was so striking that he appeared to be faking ‘bad.’” Gutride-concluded that Petrocelli was “clearly a lot brighter than his test scores reflect.”
Dr. Gutride concluded that Petrocelli is “very impulsive,” has “a high potential for violence,” is “very mistrustful of others,” and may be “a relatively high suicide risk.” Gutride diagnosed Petrocelli with “antisocial personality with paranoid features.” He noted that “[t]he personal distress he exhibited during the interview seems gen *719 uine and the client may truly desire some mental health treatment,” though his “ability to profit from such treatment is questionable” because of his distrust of others. Gutride concluded by noting that Petrocelli “can be quite dangerous to others as well as himself and treatment should be offered in a setting where the client can be closely monitored.”
Dr. Chappel reported some of the same family background information that Dr. Gutride reported. Chappel further reported that Petrocellfs arrest for kidnaping was “very traumatic” for him. Petrocelli "repeatedly asked for help” while in jail in Seattle, was seen by Dr. Petrich, and was put on an antipsychotic drug that helped him sleep. Petrocelli apparently attempted to commit suicide shortly afterwards, and was put in solitary confinement as a result. Chappel reported that Petrocelli “viewed the experience as one of asking for help and not getting it.” He recounted Petrocel-li’s description of shooting Barker. Petro-celli asserted that “there were times when a ‘black box’ of control in his head opened and a voice or an impulse told him to kill or do some other destructive act,” but that he still did not “understand why his girlfriend had to die.” Petrocelli “expresse[d] a wish for further evaluation or treatment so he [could] find out whether or not he killed on purpose.”
Dr. Chappel concluded that Petrocelli was both “depressed and angry,” with the depression “expressed through sobbing and tears,” as well as various suicide attempts. His anger was directed “primarily at the police and the district attorneys.” “He considers the Washoe County District Attorney as premeditating his murder. When this rage occurs [he] threatens to kill the prosecutor.” Chappel diagnosed Petrocelli with impulse control disorder and antisocial personality disorder. He wrote that “a more extensive evaluation” would be useful in order for Petrocelli “to have a better understanding of the reasons for his loss of impulse control and his reason for killing someone who was close to him.” Chappel observed that if Petrocel-li were “not sentenced to death and executed ... in his current state of mind he is very dangerous to those people to whom his rage is directed. A period of evaluation and a trial of treatment might serve a useful purpose in preventing any further homicidal outbursts of rage on his part.”
After these three written reports were admitted into evidence, Prosecutor Laxalt called Dr. Gutride to the stand. Gutride’s testimony was very short, filling just under two pages of transcript. In an attempt to undermine Gutride’s diagnosis and the portions of his report that were favorable to Petrocelli, Laxalt drew Gutride’s attention to his conclusion that Petrocelli had been “faking ‘bad.’ ” Laxalt asked Gutride, “Despite the faking on the IQ test, et cetera, do you think this is a valid diagnosis?” Gutride replied that he could substantiate his diagnosis of “unsocial with paranoid tendencies” with a “long history.” Gutride stated that the diagnosis “does not imply an individual is unable to think properly or conduct themselves conventionally, It relates mostly to a style of living.”
Prosecutor Laxalt then called Dr. Gerow to the stand. Defense counsel Wishart objected on the grounds of psychiatrist-patient privilege, but the court overruled the objection. Laxalt introduced no written report by Gerow. Gerow testified that he had interviewed Petrocelli for two hours on April 21, and that as a result of his interview he had formed an opinion of Petrocel-li’s “mental and emotional personality traits.” Gerow said that he agreed with Drs. Chappel and Gutride’s diagnosis of “antisocial personality.” However, Gerow referred to it as a “psychopathic” rather than an “antisocial” personality. Gerow de *720 scribed Petrocelli’s personality as “rare,” and as the personality of someone “who is very callous and selfish, someone unreliable and irresponsible.” He testified that individuals with psychopathic personalities “are repeatedly in trouble with the law,” because they “don’t believe in the rules that society set up” and do not learn from punishment. He testified that “[t]here is no treatment at all” for psychopathic personality, that the condition worsens during adolescent years, and that it “persists throughout life.” Gerow testified that the violence potential of a, psychopathic “varies,” but that the propensity for further violence is “quite high” for individuals with a history of violence. Gerow testified that being “a psychopathic” was an incurable “emotional disturbance.” Gerow concluded his direct examination testimony by stating unequivocally, “There is no cure.”
3. Jury Instructions, Final Argument, and Verdict
Before final penalty-phase arguments, the judge instructed the jury. Jury Instruction 5 provided, “If the penalty is fixed at life imprisonment without the possibility of parole, the defendant shall not be eligible for parole.” However, the instruction continued, indicating that the State Board of Pardon Commissioners had the power to release Petrocelli from prison even if the jury returned a sentence of life imprisonment without parole:
Under the laws of the State of Nevada, any sentence imposed by the jury may be reviewed by the State Board of Pardon Commissioners. Whatever sentence you return in your verdict, this Court will impose that sentence. Whether or not , the State Board of Pardon Commissioners upon review, if requested by the defendant, would change-that sentence, this Court has no way of knowing. The State Board of Pardon Commissioners, however, would have the power to modify any sentence ata later date.
In his closing argument, Prosecutor Laxalt emphasized Dr. Gerow’s testimony, Petrocelli’s incurability, and the possibility that the Board of Pardon Commissioners could release Petrocelli from prison. Laxalt maintained that Petrocelli “is, has been, and will forever remain a cool unfeeling, callous, individual, and a cold-blooded thief and killer.” “He will never change.” He continued, “Dr. Gerow has said there is no treatment; he will be a psychopathic personality, unfortunately.” “Extreme mental or emotional disturbance” cannot be a mitigating circumstance because such disturbance implies- that “there is treatment available for this person. What psychopath means, essentially, is a mean, bad person who has never changed and. who will continue to victimize,” “[N]o society, no community, no- county,, no city, no state, should ever have to risk again Tracy Petrocelli on the street,”,
In- his rebuttal argument, Prosecutor Laxalt pointed to the reports of Drs, Chappel and Gutride, noting that each had discussed the possibility of treatment: “That a period of evaluation and a time of treatment might serve a reasonable purpose ... \ Do we take that chance?” He answered this' question by emphasizing Dr. Gerow’s testimony. “[H]e will not learn from punishment. He will not learn, -he cannot learn.” Invoking, the possibility of Petrocelli’s release from prison, Laxalt concluded:
I ask. you to consider years down the road when the decisions are being made at the Pardons Board and the Parole Board and we have all gone our separate ways and Mr. Petrocelli .is there, the sole person, applying for the pardon or applying for ..parole crying tears of remorse and telling the people how it wasn’t he who was the murderer of Mr. *721 Wilson it was an accident and he got railroaded, and telling people that it wasn’t he who was the murderer of Melanie it was an accident, and he was railroaded... .-Because he will be there. He will be there.... That’s a sad fact, but it’s to be faced.
Laxalt asked that the jury “return a verdict of death for Mr. Tracy Petrocelli, a cold-blooded killer, who will always remain so.”
The jury returned a sentence of death.
II. Post-Trial Procedural History
The Nevada Supreme Court affirmed Petrocelli’s conviction and sentence. See Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985). Petrocelli filed a timely state petition for post-conviction relief, which was denied on the merits by the state courts. He then filed a federal habeas petition, which the district court dismissed without prejudice because it contained unexhausted claims. Petrocelli returned to state court to exhaust these claims, which the state courts dismissed as procedurally defaulted.
Petrocelli filed his second federal habeas petition pro se on October 28, 1994, and then filed a counseled amended petition in 1996. The amended petition raised various claims, including two claims challenging the reference to the Pardon Board in Jury Instruction 5. The first of those two claims, labeled “Ground 4,”. alleged that the instruction improperly suggested that Petro-celli could receive “a pardon or parole” if sentenced to life without the possibility of parole because it allowed the jury to “inappropriately speculate.” The second claim, labeled “Ground 6,” alleged that the jury instruction “inaccurately led the jury to believe that Petitioner, under Nevada law, could receive parole” even though Nev, Rev. Stat. § 213.1099 prohibits the granting of parole to a prisoner who has a history of “[f]ailure in- parole, probation, work release or similar programs.” The district court dismissed Ground 6 and several other grounds as an “abuse of the writ’’, because they had not been raised in Petrocelli’s first federal habeas petition. It then denied Petrocelli’s amended petition in September 1997, finding all claims either unexhausted, procedurally defaulted, or nonmeritorious.
On appeal, we reversed in part and remanded for the district court to consider various claims it had improperly, dismissed as an “abuse of the writ,” including Ground 6. Petrocelli v. Angelone, 248 F.3d 877, 884-85, 887 (9th Cir. 2001). Because in his briefing to us Petrocelli had not made any argument with respect to Ground 4, we deemed that ground abandoned. Id. at 880 n.l. On remand, the district court found various claims unexhausted and stayed Petrocelli’s petition in order to permit him to return to state court to exhaust them.
Petrocelli filed his third state petition for post-conviction relief on August 11, 2003, raising a number of claims; The state district court denied Petrocelli’s petition, denying some claims on the merits and holding some claims procedurally barred. Petrocelli appealed from the state district court’s denial, and the Nevada Supreme Court affirmed.
Petrocelli then returned to federal court and filed his fourth amended petition, the operative petition in this case. In his petition, he challenged, inter alia, Jury Instruction 5, in language similar to that used in the claim he had labeled “Ground 6” in his earlier petition. In this petition, he labeled the, challenge “Claim 4.” The district court dismissed Claim 4 after concluding that it corresponded to Ground 4 of Petrocelli’s earlier petition, which we had deemed abandoned in our earlier decision. The district court required Petrocelli to abandon various claims it deemed unex- *722 hausted, and rejected the remaining claims on the merits.
The district court issued a certificate of appealability as to three claims: (1) a claim that trial counsel was ineffective for failing to object to the admission of Powell’s testimony; (2) a claim that Petrocelli’s April 20 and 27 statements were admitted in violation of the Fifth, Sixth, and Fourteenth Amendments; and (3) a claim that introduction of Dr. Gerow’s testimony violated Petrocelli’s Fifth and Sixth Amendment rights. We issued a certificate of appeala-bility as to three additional claims, including a claim challenging Jury Instruction 5.
III. Jurisdiction and Standard of Review
We have jurisdiction over the district court’s denial of Petrocelli’s federal habeas petition pursuant to 28 U.S.C. §§1291 and 2253(c).
We review de novo a district court’s decision to grant or deny a habeas petition. Curiel v. Miller, 830 F.3d 864, 868 (9th Cir. 2016). The petition at issue was filed in 1994, well before the April 24,1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). Thus, AEDPA’s deferential standard of review does not apply. See Woodford v. Garceau, 538 U.S. 202, 207, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003); see also Thomas v. Chappell, 678 F.3d 1086, 1100 (9th Cir. 2012) (‘We have consistently held that where ... a petitioner filed a habeas application before the effective date of AEDPA and the district court retained jurisdiction over the case, AEDPA does not apply even if the petitioner files an amended petition after the effective date of AEDPA.”).
Under pre-AEDPA law, “we review de novo questions of law and mixed questions of law and fact, whether decided by the district court or the state courts.” Thomas, 678 F.3d at 1101 (alteration omitted) (quoting Sivak v. Hardison, 658 F.3d 898, 905 (9th Cir. 2011)). Whether a constitutional error was harmless is a mixed question of law and fact that is reviewed de novo. Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002). State court findings of fact are “entitled to a presumption of correctness unless they are ‘not fairly supported by the record.’ ” Silva v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002) (quoting former 28 U.S.C. § 2254(d)(8)).
IV. Discussion
A. Guilt Phase Claims
Petrocelli challenges his conviction on three grounds. First, he contends that his trial counsel was ineffective for failing to object to the testimony of Powell, the Oklahoma car salesman, on the ground that Powell’s testimony was the fruit of Petrocelli’s April 19 statement, which had been obtained in violation of Miranda v. Arizona, 384 U.S, 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Second, he contends that the use at trial of his April 20 and 27 statements violated the Fifth, Sixth, and Fourteenth Amendments. Third, he contends that a guilt-phase jury instruction defining premeditation and deliberation unconstitutionally relieved the State of its burden of proving each element of the crime beyond a reasonable doubt.
For the reasons that follow, each contention fails.
1. Powell Testimony
Petrocelli contends that trial' counsel was ineffective for failing to object to Powell’s testimony as fruit of a Miranda and Edwards violation. As recounted above, Powell was a used car salesman from whom Petrocelli had stolen a car during a test drive, in a manner similar to his theft *723 of the truck in Nevada. The prosecution learned of the prior vehicle theft during the April 19 interrogation when Petrocelli admitted he had stolen a vehicle from a “Dub Peterson” dealership in Oklahoma City.
To show ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show that his counsel’s representation “fell below an objective standard of reasonableness” and that he was prejudiced by the deficient performance. Id. at 687-88, 104 S.Ct. 2052. A failure to make a motion to suppress that is unlikely to succeed generally does not constitute ineffective assistance of counsel. See Premo v. Moore, 562 U.S. 115, 124, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011); see also Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (holding that failure to make a motion to suppress which would “be meritless on the facts and the law” does not constitute ineffective assistance of counsel).
Before beginning the interrogation on April 19, the police officers advised Petrocelli of his Miranda rights, and Pe-trocelli signed a statement indicating that he understood them. The officers then began questioning Petrocelli. For some time he answered questions freely. When he later became evasive, one of the officers observed, “I thought ... you wanted to talk to us about this.” Petrocelli responded, “I do,” and continued answering questions. Shortly afterwards, Petrocelli stated, “I’d sort of like to know what my ... lawyer wants me to do.” (Ellipsis in original.) When the officer asked if Petrocelli had understood his rights, he answered that he did. Later in the questioning, Pe-trocelli stated, “I even have a ... part-time attorney and just to answer questions for me.” (Ellipsis in original.) The officer then asked, “Is it ... what you’re telling me is you don’t want to answer any questions without an attorney?” (Ellipsis in original.) Petrocelli responded, “No. I just need to have something answered. That’s all.” The officer told him, “Well, we don’t have an attorney ... present with us right now. Like I indicated before if at any time you don’t want to ... answer any questions or make any statements you don’t have to.” (Ellipses in original.) The officer resumed questioning, and Petrocelli confessed to stealing cars by going to car lots and taking them for test drives. He mentioned one particular theft from a “Dub Peterson” dealership in Oklahoma City. This led the police to Powell, who testified at Petroeelli’s trial.
WTien a suspect invokes his Fifth Amendment right to have counsel present during a custodial interrogation, “the interrogation must cease until an attorney is present.” Miranda, 384 U.S. at 474, 86 S.Ct. 1602. Police may not continue questioning a suspect without counsel present “unless the accused himself initiates further communication.” Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880. Only an unambiguous invocation of the right to counsel triggers protection under Edwards. An invocation is unambiguous if the accused “articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.” Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Applying this test, the Supreme Court held in Davis that the statement, “Maybe I should talk to a lawyer,” was ambiguous and did not constitute a request for counsel. Id. at 462, 114 S.Ct. 2350.
Under Davis, Petrocelli’s language was insufficient to constitute an unambiguous invocation of counsel. Because Petrocelli failed to invoke his right to counsel unam *724 biguously, the .April 19 interrogation was not conducted in violation of Miranda or Edwards. Petrocelli’s trial counsel was therefore not ineffective in failing to move to suppress Powell’s testimony as fruit of the interrogation.
2. April 20 and April 27 Statements
Petrocelli contends that the use at trial of his statements to the detectives on April 20 and April 27 violated his Fifth, Sixth, and Fourteenth Amendment rights. Prosecutor Laxalt used Petrocelli’s statement that his killing of Barker was an “accident” to impeach Petrocelli’s testimony that the Wilson shooting was also an accident. Laxalt also impeached Petrocelli by confronting him with various inconsistencies between his statements and his trial testimony.
Petrocelli contends that he invoked his right to counsel on April 19, and that his statements taken on that date and thereafter were therefore taken in violar tion of his Fifth and Sixth Amendment rights. Petrocelli’s counsel was appointed on April 20 but was not present at the interrogations on April 20 and 27. Assuming without deciding that Petrocelli’s Fifth or Sixth Amendment right was violated, the rule is well established that a voluntary statement taken in violation of the Fifth or Sixth Amendment may be used for impeachment. See Michigan v. Harvey, 494 U.S. 344, 345-46, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); United States v. Gomez, 725 F.3d, 1121, 1125-26 (9th Cir. 2013). Because the State used the statements at issue only for impeachment, Petrocelli’s contention fails.
Petrocelli next contends that his April 20 and 27 statements were involuntary- and thus that, their admission was unconstitutional Statements are unconstitutionally involuntary when a “‘defendant’s will was overborne’ by the circumstances surrounding the giving of a confession.” Dickerson v. United States, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).
Petrocelli contends that his statements were involuntary because they were “obtained by inducements.” “Inducements to cooperate are not improper ... unless under the total circumstances it is plain that they have -overborne the free will of the suspect.” United States v. Okafor, 285 F.3d 842, 847, (9th Cir. 2002). Here, there is no indication that Petrocelli’s will was overborne. Before making statements on April 20, Petrocelli told officers he had several “preconditions.” Sergeant Dickson testified that Petrocelli was told that they would do what they could, but that no promises were made. His interrogators’ partial compliance with his preconditions, while perhaps an inducement to talk, hardly constituted an overbearing of his will.
Petrocelli also contends that his April 20 and 27 statements were involuntary because, on April 19, Sergeant Barnes told him that he thought talking to the detectives “could do ... nothing but help.” In Henry v. Kernan, 197 F.3d 1021 (9th Cir. 1999), we held that a confession was involuntary when the interrogating officer ignored a suspect’s clear invocation of his right to counsel and stated, “Listen, what you tell us we can’t use against you right now.” Id. at 1027. We noted-that-the officers’ refusal to cease questioning in the face of repeated requests for counsel “generate[d] á feeling of helplessness” and that the officers deliberately violated Miranda in order to obtain a statement they could use for impeachment purposes. Id. at 1028-29.
*725 The circumstances of the Henry interrogation are significantly different from those of Petrocelli’s interrogation. As discussed above, Petrocelli never clearly invoked his right to counsel on April 19. When Petrocelli was asked if he was requesting a lawyer, he responded “no.” The officers’ attempts to clarify whether Petrocelli was invoking his rights differentiate the April 19 interrogation from the Henry interrogation, both because they likely reduced the feeling of helplessness that concerned us in Henry and because they suggest the detectives were not attempting deliberately to violate Miranda. Considering the totality of the circumstances, Sergeant Barnes’ remark was not' sufficiently coercive to render Petrocelli’s April 20 and 27 statements involuntary.
3. Jury Instruction on Premeditation and Deliberation
Petrocelli contends that the jury instruction defining “premeditation” and “deliberation” violated due process by collapsing the two requirements and relieving the State' of its burden of proving that the killing was both deliberate and premeditated. See Byford v. State, 116 Nev. 215, 994 P.2d 700, 712-15 (2000); Polk v. Sandoval, 503 F.3d 903, 910-11 (9th Cir. 2007), overruled in part by Babb v. Lozowsky, 719 F.3d 1019, 1028-30 (9th Cir. 2013). The district court concluded that Petrocelli had not exhausted this claim and required Petrocelli either to abandon the claim or risk dismissal of his petition. Faced with this choice, Petrocelli filed a notice of abandonment “of all unexhausted claims.” Petrocelli contends that the district court erroneously determined that the claim was unexhausted.
“Exhaustion requires the petitioner to ‘fairly present’ his claims to the highest court of the state.” Cooper v. Neven, 641 F.3d 322, 326 (9th Cir. 2011) (quoting O’Sullivan v. Boerckel, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)). Petrocelli raised this jury instruction claim in his third state habeas petition, but he did not appeal the state district court’s denial of the claim to the Nevada Supreme Court. Petrocelli argues that his failure to appeal to the Nevada Supreme Court should be excused, contending that he could not have raised the claim until our decision in Polk in 2007, when we held that a jury instruction collapsing the premeditation and deliberation elements of first-degree murder violates the Due Process Clause. Polk, 503 F.3d at 904. This argument is unpersuasive in light of Petrocelli’s having raised this claim in the state district court, before we decided Polk, and in light of his assertion that this claim was based “on clearly established and long existing federal law, namely Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).”
B. Penalty Phase Estelle Claim
Petrocelli makes several penalty phase claims. In one of them, he contends that Dr. Gerow’s testimony violated his Fifth and Sixth Amendment rights, articulated in Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). We agree with this contention, and on that basis grant the writ as to the death penalty. We therefore do not reach Petrocelli’s other penalty phase claims.
1. Waiver
The district court held that Petrocelli’s Estelle, claim was neither unexhausted nor procedurally defaulted, and that the Nevada Supreme Court denied it on the merits. On appeal to us, the State does not contest this holding; See Robinson v. Lewis, 795 F.3d 926, 934 (9th Cir. 2015) (holding that *726 a petitioner waived an argument by failing to dispute the district court’s rejection of the argument in his briefing on appeal).
Petrocelli spends six pages of his opening brief to us arguing that the admission of Dr. Gerow’s testimony violated Estelle. The State does not respond to Petrocelli’s Estelle argument. In neither its answering brief nor its supplemental brief does the State so much as cite Estelle, let alone respond to Petrocelli’s argument. We therefore conclude that the State has waived any defense to Petrocelli’s Estelle argument.
2. Estelle
Even if the State had not waived its defense to Petrocelli’s Estelle argument, we would hold that the admission of Dr. Gerow’s testimony violated Estelle and that the violation was not harmless.
a. Estelle Violation
In Estelle, Dr. James Grigson was appointed by a Texas trial court to examine capital defendant Ernest Smith to determine his competency to stand trial. Grig-son examined Smith for about ninety minutes and determined that he was competent. Grigson gave no Miranda warning to Smith during the course of the examination. At the time of the examination, Smith’s Sixth Amendment right to counsel had attached. Grigson did not notify Smith’s attorney that he would examine his client.
Dr. Grigson testified, over objection, during the penalty phase of Smith’s trial as to his future dangerousness. He testified that Smith was “a very severe sociopath”; that Smith “will continue his previous behavior”; that Smith’s sociopathic condition will “only get worse”; and that there “is no treatment, no medicine ... that in any way at all modifies or changes this behavior.” 451 U.S. at 459-60, 101 S.Ct. 1866 (alteration in original) (internal quotation marks omitted). The jury returned a verdict of death.
The Supreme Court held that Dr, Grig-son’s testimony violated the Fifth and Sixth Amendments. The Court held that the Fifth Amendment privilege against self-incrimination applied, and that Miranda warnings were required because “Dr. Grigson’s prognosis as to future dangerousness rested on statements [Smith] made ... in reciting the details of the crime.” Id. at 464, 101 S.Ct. 1866. “When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent’s future dangerousness, his role ... became essentially like that of an agent of the State.” Id. at 467, 101 S.Ct. 1866. The Court held that the Sixth Amendment right to counsel applied because “adversary judicial proceedings” had been initiated against Smith, and that Grigson’s interview was a “critical stage” of the proceedings. Id. at 469-70, 101 S.Ct. 1866. “[Smith] was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist’s findings could be employed.” Id. at 471, 101 S.Ct. 1866.
Estelle was decided in May 1981. Dr. Gerow interviewed Petrocelli in Washoe County Jail almost a year later, in April 1982. Petrocelli’s trial took place during the last week of July and first week of August 1982.
In addressing Petrocelli’s third petition for post-conviction relief, the state district court heard testimony from Dr. Gerow and from defense counsel Wishart, and received into evidence the Washoe County Jail visitors’ log and Gerow’s April 27 letter to Prosecutor Laxalt. In rejecting a *727 claim of ineffective assistance of counsel, the court made factual findings directly relevant to Petrocelli’s Estelle claim. The court wrote:
The sequence of events appears to be as follows: Petitioner sought a psychiatrist on April 20, 1982, Laxalt briefed Gerow on April 21, and on that date, [Gerow] interviewed the Petitioner. Defense Attorney Wishart and Investigator Ford also interviewed Petitioner on April 21, 1982 subsequent to an appointment in the justice court on that date. It is not clear as to whether the doctor or the lawyer arrived at the jail first.
The court wrote, further, “Dr. Gerow and Prosecutor Laxalt are not entirely clear nor consistent about the purpose for which the doctor was hired. However, Gerow makes it clear that he informed Petitioner that the interview was not confidential and that he would see Petitioner again on an as-needed basis.” The court concluded:
Dr. Gerow’s understanding of his engagement was to determine Petitioner’s competency and to render some further treatment.... No reasonably effective trial or appellate counsel would conclude from this record that Dr. Gerow was a court-authorized psychiatrist nor an agent for the prosecutor.
The state district court’s findings are “not fairly supported by the record” and thus are not entitled to a presumption of correctness. Silva, 279 F.3d at 835 (quoting former 28 U.S.C. § 2254(d)(8)). Indeed, its findings are demonstrably wrong in nearly every particular.
First, it is not true that counsel for Petrocelli was appointed on April 21, the day of Dr. Gerow’s interview. Rather, the appointment was made the day before, on April 20.
Second, it not true that there is an ambiguity “as to whether the doctor or the lawyer arrived at the jail first.” The visitors’ log at the Washoe County Jail is unambiguous. Defense attorney Wishart and investigator Ford signed the visitors’ log at about 1:50 pm. They left at about 2:20 pm. Dr. Gerow signed the visitors’ log at about 3:50 pm.
Third, it is not true that “[n]o reasonably effective ... counsel would conclude ... that Dr. Gerow was ... an agent for the prosecutor.” Gerow wrote “D.A.” in the “relationship” box of the visitors’ log. Wis-hart knew Gerow well. He testified in post-conviction proceedings that Gerow had a “prosecution bias,” and that he never would have hired him.
Fourth, it is not true that Dr. Gerow “ma[de] clear that he informed Petitioner ... that he would see Petitioner again on an as-needed basis.” Gerow informed Prosecutor Laxalt in his April 27 letter that he would see Petrocelli on an “‘as needed’ basis.” Gerow testified in state court post-conviction proceedings that he meant “as needed by Mr. Laxalt.”
Fifth, it is not true that “Dr. Gerow’s understanding of his engagement was ... to render some further treatment.” Gerow never had any understanding that he would provide treatment to Petrocelli. Petrocelli was under the illusion that Gerow had come to see him in response to his request for psychiatric counseling, but Gerow was under no such illusion.
The facts are that Prosecutor Laxalt asked Dr. Gerow to visit Petrocelli in the Washoe County Jail to determine his competency to stand trial. Gerow interviewed Petrocelli in the jail in the late afternoon of April 21, shortly after defense attorney Wishart and investigator Ford had visited him. The Reno Justice Court had appointed the Washoe County Public Defender’s office as counsel for Petrocelli the day before, on April 20. Wishart and Ford’s names and signatures were on line three of *728 the visitors’ log of the jail, with the notation “WCPD/ATT.” Gerow signed in as a visitor on line four of the same page with the notation “D.A.” Wishart’s name and capacity would have been easily visible to Gerow when he signed in. Gerow never sought permission from Wishart to.evaluate Petrocelli. Laxalt never asked Gerow to provide treatment to Petrocelli, and Gerow never provided any. On April 27, Gerow wrote a letter to Laxalt reporting that he believed Petrocelli to be competent, and. volunteered to provide further assistance to Laxalt “as needed.” Gerow testified during the penalty phase of Petro-celli’s capital trial. He testified, based on his interview with Petrocelli on April 21, that Petrocelli was dangerous and not treatable. Gerow’s final words during direct examination were, “There is no cure.”
The parallels between Estelle and this case are striking. Dr. Grigson, like Dr. Gerow in this case, visited the defendant in jail to determine his competency to stand trial. Grigson, like Gerow, failed to provide Miranda warnings. Grigson, like Gerow, was acting as an agent of the state. Indeed, the'case against Gerow’s testimony is even stronger than against Grigson’s, for Grigson was appointed by the court, whereas Gerow was acting at the request of the prosecutor. The defendant in Estelle, like Petrocelli, already had appointed counsel. Grigson, like Gerow, did not seek or obtain permission from defendant’s counsel to visit or evaluate his client. Grig-son, like Gerow, testified during the penalty phase of defendant’s trial that the defendant was incurable.
We conclude from the foregoing that the admission of Dr. Gerow’s testimony during the penalty phase of Petrocelli’s trial was a flagrant violation of his Fifth and Sixth Amendment rights under Estelle.[1]
b. Harmless Error
An “error of the trial type” is not harmless if it “had substantial and injurious effect or influence in determining the jury’s verdict.” Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). “There must be more than a ‘reasonable possibility’ that the error was harmful.” Davis v. Ayala, — U.S. —, 135 S.Ct. 2187, 2198, 192 L.Ed.2d 323 (2015) (quoting Brecht, 507 U.S. at 637, 113 S.Ct. 1710). “[R]elief is appropriate only if the prosecution cannot demonstrate harmlessness.” Id. at 2197. Where a judge “is in ‘grave doubt as to the harmlessness of the error, the habeas petitioner must win,’” Pensinger v. Chappell, 787 F.3d 1014, 1029 (9th Cir. 2015) (quoting California v. Roy, 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam)). We conclude that the Estelle error was not harmless.
The jury knew that Petrocelli had committed two murders. He was on trial for murdering James Wilson, and the jury had been told that he had also murdered Melanie Barker. Maureen Lawler, Barker’s mother, testified at the penalty phase as to the circumstances of the three-day kidnap-ing in Washington State. Petrocelli was death-eligible because when he killed Wilson he had already been convicted of kid-naping Barker. The jury had ample basis, both legal and emotional, for imposing a *729 capital sentence. The question before us is whether it would have done so absent Dr. Gerow’s testimony. The precise question is whether there was “more than a ‘reasonable possibility’ ” that .the jury would have imposed a life sentence if it had not heard Gerow’s testimony. Davis, 135 S.Ct. at 2198 (quoting Brecht, 507 U.S. at 637, 113 S.Ct. 1710). The burden is on the State to demonstrate that there was not such a possibility.
In any capital case, particularly if a defendant might eventually be released from prison, a central question at sentencing is whether the defendant .is likely to kill again. We put to one side the report of Dr. Petrich, who evaluated Petrocelli before he killed Wilson and Barker. Not counting Petrich’s report, there was evidence from three medical professionals who diagnosed Petrocelli, assessed his dangerousness, and evaluated his amenability to treatment.
Dr. Gutride reported that Petrocelli “cried' openly” during his interview, and that his “distraught behavior had the quality of his practically begging for help.” He reported that Petrocelli “desperately wantfed] to know what is the matter with him” and told Gutride that he had “called crisis lines in every city, but [had] been unable to get any help.” Gutride observed that “[t]he personal distress [Petrocelli] exhibited during the interview seems genuine” and that Petrocelli “may truly desire some mental health treatment.” Gutride wrote that Petrocelli’s “ability to profit from such treatment is questionable” because of his distrust of others, and he concluded that “treatment should be offered in a setting where the client can be closely monitored.” In his live testimony, Gutride stated that his diagnosis did not “imply an individual is unable[1] to think properly or conduct themselves conventionally. It relates mostly to a style of living.”
Dr. Chappel reported that Petrocelli “repeatedly asked for help” while in jail in Seattle, and that Petrocelli[1] attempted to commit suicide while there.- Chappel reported that Petrocelli “viewed the experience as one of asking for help and not getting it.” Petrocelli “expressed] a wish for further evaluation or treatment so he [could] find out whether or not he killed on purpose.” Chappel concluded that “a more extensive evaluation” would be-useful in order for Petrocelli “to have a better understanding of the reasons for his loss of impulse control and his reason for killing someone who was close to him.” Chappel wrote that “[a]-period of evaluation and a trial of treatment might serve a useful purpose in preventing any further homicidal outbursts of rage on his part.”
Both Dr. Gutride and Dr. Chappel concluded that Petrocelli wanted mental health treatment, and that he felt that he had sought and been denied such treatment. Both doctors held out the possibility of treatment. Gutride acknowledged that Petrocelli’s ability to profit from treatment was “questionable” because of his distrust of others, but he did'not state that Petro-celli was unbeatable. Rather, he recommended that Petrocelli be “closely monitored” during treatment. Chappel stated that treatment could be useful both for Petrocelli’s own understanding and in order to prevent “further homicidal outbursts.”
Dr. Gerow’s testimony was inconsistent with the reports of Drs,. Gutride and Chap-pel. Gerow stated unequivocally that Pe-trocelli was dangerous and would always remain so. He testified that Petrocelli had a psychopathic personality for which there is “no treatment at all.” He elaborated, “A psychiatrist doesn’t treat the condition because'it’s. not treatable.” Gerow’s last words on direct examination were, “There is no cure.” ' .
*730 Dr. Gerow’s live testimony likely had a greater impact on the jury than the analy-ses of Drs. Gutride and Chappel. Defense counsel Wishart chose not to put Gutride and Chappel on the stand, submitting only their written reports. Prosecutor Laxalt called Gutride to the stand in an attempt to undermine his diagnosis and assessment of dangerousness on the ground that Pe-trocelli had “faked ‘bad’ ” when taking formal intelligence tests. Gutride insisted that his diagnosis was correct, and that the diagnosis did not “imply an individual is unable to think properly or conduct themselves conventionally.” Gutride’s live testimony was very short, occupying not quite two pages of transcript. His testimony was followed directly by Gerow’s more extensive live testimony that conflicted with Gutride and Chappel’s written reports and Gutride’s brief testimony. See Satterwhite v. Texas, 486 U.S. 249, 259-60, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (referring to a psychiatrist’s testimony that defendant was “beyond ... rehabilitation” as his “most devastating” statement).
The effect of Dr. Gerow’s testimony was magnified by Jury Instruction 5, quoted above. Jury Instruction 5 indicated to the jury that even if it sentenced Petrocelli to life without parole, he might nonetheless be released by the Nevada Board of Pardon Commissioners.[2] Prosecutor Laxalt made sure that the jury understood the implications of Jury Instruction 5. In closing argument he emphasized Dr. Gerow’s testimony that Petrocelli was an incurable psychopath, and the possibility of Petrocel-li’s release on parole:
He will never change. There is no cure for being a psychopath.... Should the community bear the risk of ever having this defendant on the street again, walking free, on the run?
[[Image here]]
[N]o society, no community, no county, no city, no state, should ever have to risk again Tracy Petrocelli on the street.
[[Image here]]
I ask you to consider years down the road when the decisions are being made at the Pardons Board and the Parole Board and we have all gone our separate ways and Mr. Petrocelli is there, the sole person applying for the pardon or applying for parole crying tears of remorse and telling the people how it wasn’t he who was the murderer of Mr. Wilson it was an accident and he got railroaded, and telling people that it wasn’t he who was the murderer of Melanie it was an accident, and he was railroaded.... Rehabilitation to be imposed in this case? That’s a sad fact, but it’s to be faced.
It is possible that Petrocelli has not preserved, on appeal to us, his ability to challenge the district court’s dismissal of Claim 4, challenging Jury Instruction 5. But whether Petrocelli may now challenge the instruction is irrelevant to the harmlessness of the Estelle violation. In determining harmlessness, the question before us is not the constitutionality of the instruction but rather its effect on the improper admission of Dr. Gerow’s testimony. Whether Jury Instruction 5 is constitutional or not, its effect on Gerow’s improperly admitted testimony is the same.
*731 We have encountered Dr. Gerow before. He testified for the prosecution in Sechrest in very much the same manner he testified for the prosecution in the case before us. Gerow testified that Sechrest “was an incurable sociopath” who was “extremely dangerous and could not be rehabilitated.” Sechrest, 549 F.3d at 813. We held in Sechrest that the combined effect of Gerow’s testimony and an instruction identical to Instruction 5 “had a substantial influence on the jury’s decision to sentence Sechrest to death.” Id. We similarly conclude, in this case, that Gerow’s improperly admitted testimony, understood in the light of Jury Instruction 5, “had [a] substantial and injurious effect or influence in determining the jury’s verdict.” Brecht, 507 U.S. at 637, 113 S.Ct. 1710 (quoting Kotteakos, 328 U.S. at 776, 66 S.Ct. 1239). Because there was “more than a ‘reasonable possibility’ ” that the jury would have imposed a life sentence absent the Estelle error, the error was not harmless. Davis, 135 S.Ct. at 2198 (quoting Brecht, 507 U.S. at 637, 113 S.Ct. 1710).
Conclusion
We affirm the district court’s denial of Petrocelli’s petition for a writ of habeas corpus with respect to the conviction, but reverse with respect to the death sentence. We remand with instructions to grant the writ as to the penalty unless, within a reasonable time, the State grants a new penalty phase trial or imposes a lesser sentence consistent with the law.
AFFIRMED in part, REVERSED in part, and REMANDED.

. Even if the introduction of Dr. Gerow’s testimony could be understood as a rebuttal of Petrocelli’s psychological evidence that suggested that Petrocelli would benefit from treatment, see Buchanan v. Kentucky, 483 U.S. 402, 422-23, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the admission of the testimony would still violate the Sixth Amendment because Petrocelli’s counsel never received notice of the examination, see Powell v. Texas, 492 U.S. 680, 685, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) (per curiam)..

, In Sechrest v. Ignacio, 549 F.3d 789, 810 (9th Cir. 2008), we held in a Nevada capital case that an instruction identical to Jury Instruction 5 was unconstitutional because it was inaccurate. At the time of Sechrest’s trial, “an individual who [was] on probation at the time he committed] another offense ... [was] not eligible for parole by the Parole Board on that offense.” Id. at 810. We do not reach the question whether Jury Instruction 5 was constitutional at the time of Petrocelli's trial.